DAVID R. ZARO (BAR NO. 124334)
JOSHUA A. DEL CASTILLO (BAR NO. 239015)
MATTHEW D. PHAM (BAR NO. 287704)
ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
865 South Figueroa Street, Suite 2800
Los Angeles, California 90017-2543
Phone: (213) 622-5555
Fax:  (213) 620-8816
E-Mail:  dzaro@allenmatkins.com
         jdelcastillo@allenmatkins.com
         mpham@allenmatkins.com

Attorneys for Plaintiff
GEOFF WINKLER, RECEIVER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEOFF WINKLER, Receiver,<br><br>Plaintiff,<br><br>vs.<br><br>CHARLES R. GRIMM, an individual; BLUE PACIFIC BIO-ENERGY, INC., a California corporation; GRIMM INVESTMENTS, LLC, a California limited liability company; and DOES 1–10, inclusive,<br><br>Defendants. | Case No. 2:22-cv-05735<br><br>**COMPLAINT FOR FRAUDULENT TRANSFER** |

Plaintiff Geoff Winkler (the "Receiver" or "Plaintiff"), the Court-appointed permanent receiver for Essex Capital Corporation ("Essex") and its subsidiaries and affiliates (collectively, with Essex, the "Receivership Entities" or "Entities"), hereby brings the following complaint (the "Complaint") against the above-captioned defendants (collectively, "Defendants," and individually, a "Defendant"). In support of the Complaint, the Receiver alleges as follows:

**JURISDICTION AND VENUE**

1.  This Court has jurisdiction over the above-captioned civil action pursuant to 28 U.S.C. §§ 1345 and 1367(a) and the doctrines of ancillary and

supplemental jurisdiction, in that this action arises from a common nucleus of operative facts as, and is substantially related to the original claims in, the enforcement action brought by the Securities and Exchange Commission (the "SEC"), captioned as *SEC v. Iannelli, et al.* and bearing Case No. 2:18-cv-05008-FMO-AFM (the "SEC Action"), which is currently pending before the United States District Court for the Central District of California.

2.     This Court may exercise personal jurisdiction over each Defendant pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 754 and 1692.

3.     Venue in the Central District of California is proper under 28 U.S.C. § 1391 because (a) this action is an ancillary proceeding to the SEC Action, which is pending in this district, and (b) the Receiver was appointed in this district and specifically authorized to "institute, pursue, and prosecute all claims and causes of action of whatever kind and nature that may now or hereafter exist as a result of the activities of [the Receivership Entities]" and to "institute . . . or become party to such actions or proceedings in state, federal, or foreign courts, which . . . the Receiver deems necessary and advisable to preserve or recover any [assets of the Receivership Entities]" pursuant to this Court's *Order Regarding Preliminary Injunction and Appointment of a Permanent Receiver* (the "Appointment Order"), entered on December 21, 2018, in the SEC Action, and such authority was reaffirmed by this Court's *Order Regarding Permanent Injunction* (the "Permanent Injunction Order") entered on September 9, 2019, in the SEC Action, including the Receiver's authority to prosecute the claims alleged herein.

## PARTIES

4.     The Receiver is the duly appointed permanent receiver for the Receivership Entities. Among other things, the Appointment Order directed the Receiver to, for the benefit of creditors of, and investors in, the Entities, recover and marshal any and all assets owned, leased, occupied, or otherwise controlled by the

Entities (collectively, the "Receivership Assets" or "Assets"), and the Permanent Injunction Order reaffirmed the Receiver's rights and duties, including his authority to recover and marshal Receivership Assets. Pursuant to the Appointment Order and Permanent Injunction Order, the Receiver enjoys exclusive authority and control over the Assets, including over the claims for relief alleged herein.

5. On information and belief, Defendant Charles R. Grimm ("Grimm") is an individual residing in Santa Barbara County, California, and is an identified recipient of Receivership Assets, as described further herein.

6. On information and belief, Defendant Blue Pacific Bio-Energy, Inc. ("Blue Pacific") is a California corporation with its principal place of business in Santa Barbara County, California, and is an identified recipient of Receivership Assets, as described further herein.

7. On information and belief, Defendant Grimm Investments, LLC ("Grimm Investments") is a California limited liability company with its principal place of business in Santa Barbara County, California, and is an identified recipient of Receivership Assets, as described further herein.

8. On information and belief, Grimm, Blue Pacific, and Grimm Investments are instrumentalities of one another, such that any one of them can exercise authority and control over any and all of them.

9. The Receiver is ignorant of the true names and capacities, whether individual, corporate, associate, or otherwise, of Does 1 through 10, inclusive. On information and belief, each fictitiously named Defendant is a recipient of fraudulently transferred funds from the Receivership Entities, or was, in some way, responsible for, participated in, or contributed to the matters and things herein alleged and has, in some fashion, legal responsibility therefor. When the identity and exact nature of such fictitious Defendants and their responsibility for, participation in, and contribution to the matters and things herein alleged are

ascertained, the Receiver will seek to amend this Complaint and all proceedings herein to set forth the nature of those Defendants' identities.

10. On information and belief, Does 1 through 10 are principals, officers, agents, or affiliates of each of the other Defendants and directed, ratified, or caused the conduct or omissions alleged herein. On information and belief, Does 1 through 10 are the alter egos of the other Defendants and, as such, are liable for the conduct and damages herein alleged against the other Defendants.

## GENERAL ALLEGATIONS

### A. The Establishment of the Receivership Entities and Their Misappropriation of Investor Funds.

11. As alleged by the SEC in its complaint filed on June 5, 2018, in the SEC Action (the "SEC Complaint"), Ralph Iannelli ("Iannelli") had been Essex's sole shareholder, president, and chief executive officer since approximately 1996 and throughout the entirety of the scheme described herein.

12. As alleged by the SEC in the SEC Complaint, Iannelli attracted investment into Essex through the sale of promissory notes, the returns on which were alleged to be based on the strength of Essex's equipment-leasing business, which would purportedly generate sufficient income to fully offset its borrowing costs and payment obligations to the investors holding promissory notes.

13. As alleged by the SEC in the SEC Complaint, between 2014 and early 2017, Essex's main source of capital was the funds that it received from investors (who, in exchange, had received promissory notes from Essex or equity interests in joint ventures with Essex or Iannelli), not income or revenue derived from Essex's equipment-leasing business.

14. As alleged by the SEC in the SEC Complaint, Essex was unable to cover the principal and interest obligations that it owed to its investors under the promissory notes using the equipment-leasing revenue alone. As alleged by the SEC in the SEC Complaint, payments on those existing obligations were instead

made in large part from money obtained from later investors, in a manner consistent with the operations of a Ponzi scheme.

15. On December 21, 2018, and in part on the basis of the allegations contained with the SEC Complaint, this Court entered the Appointment Order, pursuant to which the Receiver became the duly appointed permanent receiver for the Receivership Entities. The Permanent Injunction Order, which reaffirmed the Receiver's appointment and authority, was then entered on September 9, 2019.

**B. The Receiver's Authority and Investigation Pursuant to His Appointment.**

16. Pursuant to the terms of his appointment, the Receiver is vested with exclusive authority and control over the Receivership Assets. Specifically, Article XI of the Appointment Order and Article VII of the Permanent Injunction Order vest the Receiver with the "full powers of an equity receiver, including, but not limited to, full power over all funds, assets, [and] collateral," which includes the "full power to sue, foreclose, marshal, collect, receive, and take into possession all such Assets." Moreover, the Appointment Order authorizes, empowers, and directs the Receiver to, among other things, (a) conduct such investigation and discovery as necessary to identify and locate outstanding Receivership Assets, and (b) preserve and prevent the dissipation of Receivership Assets.

17. In connection with these duties, the Receiver has reviewed and analyzed more than 500,000 pages of materials, reflecting hundreds of thousands of individual transactions relating to the business and financial activities of the Receivership Entities. This effort has enabled the Receiver to identify and quantify a significant portion of those transactions relating to recoverable Receivership Assets.

18. On the basis of his investigation and analysis, the Receiver has confirmed that the operations of the Receivership Entities were not profitable and were unsustainable absent ongoing infusions of new funds from investors and

lenders. The Receiver has confirmed that Essex's payments of so-called returns on investments to investors, including Defendants, during the period commencing no later than in or around 2006 and terminating upon the date of the Receiver's appointment, were funded by money obtained from new investors, consistent with the operations of a Ponzi scheme. On this basis, and as detailed significantly in the Receiver's prior submissions to the Court in the SEC Action, including his *Forensic and Investigative Accounting Report* filed in the SEC Action on June 11, 2020 (the "Forensic Report"), and his *Supplemental Forensic and Investigative Accounting Report* filed in the SEC Action on April 25, 2022 (the "Supplemental Forensic Report"), the Receiver has concluded and reported to the Court that the activities of the Receivership Entities bear the hallmarks of a Ponzi investment scheme.

19. Specifically, and in connection with their efforts to obtain investments from investors, the Receivership Entities represented to investors that they would be paid returns generated from the business operations of the Entities including, but not limited to, their equipment-leasing operations. However, commencing in or around 2006—and potentially earlier—the revenues generated by the Entities' business operations, alone, were insufficient to satisfy existing payment obligations to investors.

20. As a result, in or around 2006, and because the revenues generated by their business operations were insufficient to satisfy existing payment obligations to investors, the Receivership Entities diverted funds raised from later investors to make payments owed to earlier investors.

21. The Receivership Entities did not alert investors to the fact that their business operations did not generate sufficient revenue to yield the returns promised to investors. Nor did the Entities advise investors that they were using funds raised from later investors to satisfy existing payment obligations to earlier investors. Instead, the Entities maintained the fiction that payments to investors were made from revenues generated by their business operations.

22. On the basis of these actions, and as detailed in his Forensic Report and Supplemental Forensic Report, the Receiver determined that the business and financial activities of the Receivership Entities are consistent with a Ponzi investment scheme, at a minimum during the period from 2006 through the end of 2018 (the "Ponzi Period").

23. On the basis of his detailed analysis and accounting, the Receiver has also confirmed that, as in most Ponzi schemes, certain investors who had invested money in or contributed money to the Receivership Entities were paid more from the Entities than what they had invested or contributed (the "Net Winners"), while other investors lost money on their investments or contributions (the "Net Losers"). The Receiver has concluded, in his reasonable business judgment, that in order to recover and return as much as possible to those investors and creditors with claims against the Entities, including Net Losers, and consistent with the law in the Ninth Circuit, it is necessary and appropriate to pursue the disgorgement of profits paid to the Net Winners, including those Defendants identified in this action.

24. Accordingly, and, in part, on the basis of his determinations regarding the Receivership Entities' business and financial activities, the Receiver filed the *Motion of Receiver, Geoff Winkler, for Authority to Establish Disgorgement Procedures and Undertake Disgorgement Efforts* (the "Disgorgement Motion") in the SEC Action on October 13, 2020, pursuant to which the Receiver sought authority to establish disgorgement procedures and undertake disgorgement efforts against any Net Winners, including those Defendants identified in the above-captioned action. The Court then entered the *Order Granting Motion of Receiver, Geoff Winkler, for Authority to Establish Disgorgement Procedures and Undertake Disgorgement Efforts* (the "Disgorgement Order") in the SEC Action on November 12, 2020, granting the Receiver's Disgorgement Motion and authorizing him to commence disgorgement actions against any Net Winners, including this action against Defendants.

### C. The Fraudulent Transfers to Defendants from the Receivership Entities.

25. Upon his appointment, the Receiver promptly moved to secure control over the Entities' offices, Assets, and operations, including their electronic and physical records and data. Altogether, the records collected or obtained by the Receiver comprised more than 500,000 pages of materials, which took him and his staff considerable time to review and investigate. Despite the significant volume of records obtained, there was no readily apparent mechanism for the Receiver to identify Net Winners quickly and definitively, without reconstructing financial receipts and disbursements for the Receivership Entities. Accordingly, at the outset of his appointment and for a relatively significant time thereafter, the Receiver was unable to identify specific payments received from individual investors or payments made to individual investors, including payments received from or made to Defendants by the Entities.

26. The Receiver and his staff devoted considerable time and effort to investigating the Receivership Entities' business and financial activities, including in connection with the Receiver's efforts to identify and marshal any Assets held by third parties in wrongful possession thereof, including Defendants. Given the volume of records and complexity of the Entities' financial affairs, the Receiver did not discover until well after his appointment that Defendants had received amounts in excess of their investments in, or contributions to, the Entities.

27. As a result of his investigation and analysis, the Receiver has identified Defendants as Net Winners, who had realized an overall net profit in the amount of **$1,161,852.24** (the "Profit Amount") on their investments in, or contributions to, the Entities. The Profit Amount was calculated by subtracting (a) the aggregate amount of the transfers of money from Defendants to the Entities (which the Receiver identified as totaling **$4,781,011.42**) from (b) the aggregate amount of the transfers of money from the Entities to Defendants (which the Receiver identified as totaling

**$5,942,863.66**), resulting in a calculation of the net profits paid to Defendants. A schedule listing the transfers of money between the Entities and Defendants as identified by the Receiver is attached hereto as **Exhibit 1**.

28. Out of the $5,942,863.66 that Defendants altogether received from the Receivership Entities, $2,382,081 was received by Defendants on or after April 13, 2014, notably an amount greater than their total Profit Amount.

29. On information and belief, Defendants provided no goods, services, or other value to the Receivership Entities in exchange for the transfers of money that comprise the Profit Amount.

30. Once he identified Defendants as Net Winners and calculated their Profit Amount, the Receiver promptly pursued the recovery of the Profit Amount from Defendants by first delivering a demand letter on or about January 8, 2021.

31. On or about April 13, 2021, the Receiver, on the one hand, and Grimm, Blue Pacific, and Grimm Investments, on the other hand, through their respective counsel, entered into a tolling agreement (the "Tolling Agreement"). A true and correct copy of the Tolling Agreement is attached hereto as **Exhibit 2**.

32. Pursuant to the Tolling Agreement, the parties agreed to toll any and all applicable statutes of limitations and repose with respect to any claims of the Receiver against Grimm, Blue Pacific, or Grimm Investments relating to the transfers of money that they received from the Receivership Entities. The tolling period under the Tolling Agreement began on April 13, 2021, and would continue until a date ten days after receipt of a written notice of termination (the "Termination Notice") given by one party to the Tolling Agreement to the others.

33. On August 4, 2022, the Receiver received a Termination Notice from Grimm, Blue Pacific, and Grimm Investments.

///

///

///

# FIRST CLAIM FOR RELIEF

### (For Avoidance and Recovery of Actual Fraudulent Transfers)

### (Against All Defendants)

34. The Receiver incorporates herein each and every allegation contained in Paragraphs 1 through 33, inclusive, set forth above.

35. On the basis of his investigation and analysis of the Receivership Entities' business and financial activities, the Receiver has confirmed that (a) a Ponzi investment scheme was operated through the Entities during at least the Ponzi Period; (b) Defendants received transfers of money from the Entities totaling $5,942,863.66 in connection with their investments in, or contributions to, the Entities (all of which took place during the Ponzi Period); and (c) such transfers of money from the Entities to Defendants were made from the proceeds of or in furtherance of the Ponzi investment scheme operated through the Entities, and generated from investors in, or creditors of, that scheme. Accordingly, the Entities made such transfers of money to Defendants with the actual intent to hinder, delay, or defraud their creditors.

36. Defendants received the transfers of money from the Receivership Entities either as an initial transferee or as an immediate or mediate transferee.

37. The Receivership Entities received nothing of value from Defendants in exchange for the transfers of money comprising the Profit Amount to Defendants.

38. As a consequence, the transfers of money comprising the Profit Amount are actual fraudulent transfers under the California Uniform Voidable Transactions Act, California Civil Code §§ 3439–3439.12, and, on information and belief, the investors in, and creditors of, the Receivership Entities, as well as the receivership estate of the Entities, which the Receiver is charged with administering, have been harmed as a result of such actual fraudulent transfers in at least the Profit Amount, which amount, plus interest, is subject to immediate avoidance and recovery by the Receiver, in his capacity as receiver for the Entities.

## **PRAYER FOR RELIEF**

WHEREFORE, the Receiver prays for judgment against Defendants and in favor of the Receiver as follows:

1. For a judgment against Defendants, avoiding and recovering the transfers of money from the Receivership Entities to Defendants comprising the Profit Amount;

2. For an order deeming the Profit Amount paid to Defendants to be held in constructive trust for the benefit of the Receivership Entities;

3. For an order directing Defendants to pay the Profit Amount, plus prejudgment interest and costs, to the Receiver;

4. For an order directing Defendants to be held jointly and severally liable for the Profit Amount;

5. For prejudgment interest as allowed by law;

6. For costs of suit and reasonably attorneys' fees; and

7. For such other and further relief as the Court may deem proper.

Dated: August 12, 2022

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
DAVID R. ZARO
JOSHUA A. DEL CASTILLO
MATTHEW D. PHAM

By: _____/s/ Matthew D. Pham_____
MATTHEW D. PHAM
Attorneys for Plaintiff
GEOFF WINKLER, RECEIVER